<u>NOT FOR PUBLICATION</u>

<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE DISTRICT OF NEW JERSEY</u>

| | | |
|---|---|---|
| IDT CORPORATION, | : | |
| WINSTAR COMMUNICATIONS, L.L.C., | : | |
| and WINSTAR OF NEW JERSEY, L.L.C., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| BUILDING OWNERS AND MANAGERS | : | Civil Action No. 03-4113 (JAG) |
| ASSOCIATION INTERNATIONAL, | : | |
| BUILDING OWNERS AND MANAGERS | : | **O P I N I O N** |
| ASSOCIATION OF NEW JERSEY, | : | |
| TRIZEC PROPERTIES, INC., | : | |
| TRIZECHAHN NEWPORT, L.L.C., and | : | |
| TRIZEC REALTY, INC., | : | |
| | : | |
| Defendants. | : | |
| | : | |

<u>GREENAWAY, JR., U.S.D.J.</u>

This matter comes before the Court on the reinstated motion of Defendants Trizec Properties, Inc., TrizecHahn Newport, L.L.C., and Trizec Realty, Inc. (collectively "Trizec")[1] to dismiss the Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motion is granted; the Complaint is dismissed without prejudice as to Counts 1, 2, 4, and 5, and dismissed with prejudice as to Count 3.

---

[1] Defendants CarrAmerica Realty Corp., CarrAmerica Development, Inc., Trammel Crow Company, CB Richard Ellis, Inc., Hines Corporate Properties, L.L.C., and Hines Interest, L.P. originally joined in Trizec's motion to dismiss. Subsequently, these parties were terminated from the litigation.

## BACKGROUND

Plaintiff IDT Corporation, and its wholly-owned subsidiaries Winstar Communications, L.L.C. and Winstar of New Jersey, L.L.C. (collectively "Winstar"), provide telecommunications services to residential and business customers, as well as other telecommunications carriers, throughout the United States.  (Complaint ("Compl."), at ¶¶ 13-14.)

Winstar's Complaint names two categories of defendants: trade associations Building Owners and Managers Association International ("BOMA") and Building Owners and Managers Association of New Jersey ("BOMA-NJ"), and building owner-managers ("Building Defendants"), including Trizec.

Defendant BOMA is a non-profit trade association for the commercial real estate industry that provides advice, research, and legal and legislative advocacy for its members.  BOMA's members own and manage roughly eighty percent of the commercial office space in the United States.  (Compl. ¶ 3.)  Defendant BOMA-NJ is a separate non-profit corporation that provides research, advisory, and advocacy services related to the New Jersey commercial real estate market.  (BOMA Br. at 5.)

Defendant Trizec owns, manages or provides real estate services for commercial real estate properties throughout the United States.  (Building Defs.' Br. in Supp. of Mot. to Dismiss ("Building Defs.' Br.") at 3.)  Trizec Properties, Inc. is a real estate investment trust ("REIT") that owns and leases commercial real estate properties and is a member of BOMA.  (Compl. ¶ 20.)  TrizecHahn Newport, L.L.C. and Trizec Realty, Inc. are subsidiaries of Trizec Properties, Inc.  (Compl. ¶¶ 21-22.)

Parties like Winstar are relatively new.  With the passage of the Telecommunications Act

2

of 1996 ("the Act"), Congress enacted provisions designed to promote competition in the local telecommunications markets, which traditionally had been served by one incumbent local exchange carrier ("ILEC").[2]  (Compl. ¶ 36) (citing 47 U.S.C. § 151 et seq.).  Pursuant to the Act, competitive local telecommunications providers like Winstar (also known as competitive local exchange carriers or "CLECs") began to enter local markets and offer the ILECs' customers a choice in telecommunications services.  (Compl. ¶ 36.)

Since the passage of the Act, the Federal Communications Commission ("FCC") has continued to monitor the development of competition in the market for the provision of telecommunications services.  (BOMA Br. at 9.)  In 2000, the FCC adopted a measure prohibiting telecommunications carriers from entering into contracts that restrict owners and managers of commercial buildings from granting access to competing carriers.  (BOMA Br. at 9.) Without access to the building rooftops and to the internal ducts and conduits of these buildings, companies like Winstar cannot deliver telecommunications services to tenants in those buildings. (Compl. ¶ 3.)  At the same time, however, the FCC declined to adopt a rule prohibiting owners and managers from entering into contracts with various telecommunications providers that may contain different terms and fees for building access.  (BOMA Br. at 9.)

Winstar alleges that, beginning in 1997 and continuing through the present, the Building Defendants, through and with their trade associations (BOMA and BOMA-NJ), have used their

---

[2] The parties use several different acronyms in their briefs: ILEC (incumbent local exchange carrier, such as Verizon); CLEC (competitive local exchange carrier, such as Winstar); MTE (multiple tenant environment, i.e., an office building accommodating both ILECs and CLECs); REIT (real estate investment trust); RBOC (regional bell operating company, such as Verizon or other ILECs that historically served local telecommunications markets before the 1996 amendments to the Communications Act opened such markets to competition from CLECs). (Compl. ¶ 36.)

"collective control of the commercial real estate market to deny Winstar access to their tenants and, when granted, to condition building access by Winstar on exclusionary and anticompetitive terms and conditions, including price." (Compl. ¶ 3.) Winstar claims that, as a result of Defendants' conduct, it has been:

> unable to serve many customers that have requested service, has been impeded in its entry into the telecommunications market, and has been harmed in its ability to compete with Verizon and other ILECs. Competition in the commercial telecommunications market has accordingly been eliminated or restrained, injuring Winstar in its business and harming commercial office building tenants by limiting their choices in communications services.

(Compl. ¶ 7.) On August 29, 2003, Winstar filed a five-count complaint,[3] seeking relief for: (1) violations of § 1 of the Sherman Act, 15 U.S.C. § 1 (2004), based on allegations of horizontal price fixing, concerted refusals to deal (group boycott), and conspiracy to impose discriminatory prices in violation of the rule of reason; (2) violation of the New Jersey Antitrust Act, N.J. STAT. ANN. §§ 56:9-1 to 56:9-18 (1970); (3) violation of §§ 201(b) and 202(a) of the 1934 Communications Act, as amended, 47 U.S.C. §§ 201(b) and (202)(a); (4) tortious interference with prospective business relations; and (5) breach of duty of good faith and fair dealing. (Compl. ¶¶ 50-89.) On April 12, 2004, both BOMA and the Building Defendants filed the instant motions to dismiss the complaint, pursuant to FED. R. CIV. P. 12(b)(6).

_____On April 23, 2004, Winstar filed a complaint in the District Court for the Southern District of New York ("New York"), naming as defendants several building owners and managers, together with their trade association, BOMA-NY, and alleging that the defendants conspired in violation of § 1 of the Sherman Act to disadvantage Winstar in favor of ILECs.

---

[3] Counts 3 and 5 are against the Building Defendants only.

4

(Defs.' Joint Supplemental Mem. of Law in Supp. of Their Mot. to Dismiss, dated Feb. 4, 2005 ("Defs.' Mem."), at 3); Winstar Communications, LLC v. Equity Office Properties Inc., No. 04-3139 (S.D.N.Y. Jan. 24, 2005) (order granting motion to dismiss, at 1) [hereinafter "J. Wood's order"]. The defendants in the New York action also filed a motion to dismiss.

On December 1, 2004, Judge Wood conducted oral argument regarding the motion to dismiss in the New York action. On December 21, 2004, oral argument was held before this Court regarding Defendants' Motions to Dismiss in the instant action. On January 24, 2005, the New York action was dismissed with prejudice, on the ground that Winstar did not have standing to bring the suit under the antitrust laws. (J. Wood's order at 3.)

In light of the dismissal of the New York action, Trizec, with other defendants, submitted a Joint Supplemental Memorandum of Law in Support of Their Motions to Dismiss. Trizec argued that Winstar's antitrust claims in this action are "substantially identical" to those dismissed by Judge Wood in the New York action, and that Winstar lacks standing to raise Sherman Act claims before this Court. More specifically, Trizec asserts that, as in the New York action, Winstar's Complaint is likewise deficient here because "Winstar has alleged no more than harm to *itself* and to *its* business, and not harm to competition." (Defs.' Mem. at 2.) Thus, Trizek seeks dismissal of the Complaint, or alternatively, a stay of all proceedings pending resolution of Winstar's appeal to the Second Circuit Court of Appeals. (Defs.' Mem. at 2.)

Winstar argues in opposition that Defendants' Motion to Dismiss, and alternative plea for a stay, should be denied because Judge Wood's opinion is irrelevant and not dispositive. (Pls.' Supplemental Mem. of Points and Authorities on Antitrust Injury, dated Feb. 22, 2005 ("Pls.' Mem."), at 2.) Winstar contends that: (1) the actions do not present substantially identical

antitrust claims, as the instant action includes a group boycott claim in addition to price fixing; (2) "Judge Wood's opinion is mistaken and poorly reasoned"; (3) Judge Wood's opinion is not binding precedent and has no collateral estoppel effect; and (4) Judge Wood did not permit Winstar an opportunity to amend its complaint to cure the antitrust injury pleading deficiencies. (Pls.' Mem. at 2-6.)

On June 30, 2005, Trizec and Plaintiffs stipulated to the withdrawal without prejudice of Trizec's motion to dismiss, subject to the condition that Trizec could reinstate the motion at any time, to be then decided by this Court upon the record as it existed as of June 28, 2005.  On October 20, 2005, Trizec filed a request that the motion to dismiss be reinstated.

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, pursuant to FED. R. CIV. P. 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party.  See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994).  A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim.  See In re Warfarin Sodium, 214 F.3d 395, 397-98 (3d Cir. 2000).  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping

legal conclusions cast in the form of factual allegations.  See Morse v. Lower Merion Sch. Dist.,

132 F.3d 902, 906 (3d Cir. 1997).  "The pleader is required to 'set forth sufficient information to

outline the elements of his claim or to permit inferences to be drawn that these elements exist.'"

Kost v. Kozakewicz, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A CHARLES ALAN WRIGHT &

ARTHUR MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357).  It is not proper for a court to

"assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have

violated the antitrust laws in ways that have not been alleged."  Associated Gen. Contractors of

California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983).

## DISCUSSION

In its Complaint, Winstar makes no specific statements about any Trizec entity, beyond

naming Trizec as a defendant.  The Complaint includes Trizec when referring either to all

defendants, or to the building owner-manager defendants (hereinafter, "Defendants").

### A.    Standing – Counts 1 & 2 – Federal and State Antitrust Claims

As a preliminary matter, this Court must determine whether Winstar has standing to sue

under the antitrust laws, which are, along with the alleged Communications Act violations, the

basis for this Court's subject matter jurisdiction over this action.  Trizec, largely relying on Judge

Wood's dismissal of the New York action for lack of antitrust standing, argues that Winstar lacks

standing to raise its antitrust claims because it has failed to allege antitrust injury.  (Defs.' Mem.

at 1.)  More specifically, Trizec asserts that Plaintiffs cannot establish antitrust standing because

"just as in [the] New York [action], Winstar has alleged no more than harm to *itself* and to *its*

business, and not harm to competition; thus, here just as in New York, Winstar's antitrust

complaint should be dismissed for failure to state a claim."  (Defs.' Mem. at 2.)

Winstar disagrees in several respects.  First, Winstar counters that Defendants' reliance on the New York action is misplaced because this action is not similar to the New York action. (Pls.' Mem. at 3.)  For example, Winstar argues that, unlike the New York action, this case involves a <u>per se</u> group boycott claim in addition to a <u>per se</u> price fixing claim, whereas the New York action raised only price fixing claims.  (Pls.' Mem. at 3.)  Therefore, Winstar disputes Defendants' contention that the instant action presents antitrust claims that are "'substantially identical'" to those raised in the New York action.  (Pls.' Mem. at 2) (quoting Defs.' Mem. at 1, 3).  Winstar contends that it "has suffered antitrust injury for purposes of its group boycott claim without regard to Judge Wood's ruling on standing with respect to price fixing."  (Pls.' Mem. at 3.)  Winstar further maintains that Judge Wood's ruling is not controlling because it is "mistaken and poorly reasoned" in its conclusion that Winstar has only alleged injury to itself, and not harm to competition in the marketplace.  (Pls.' Mem. at 3-5.)  Finally, Winstar asserts that Judge Wood's ruling is not binding precedent upon this Court, and that Judge Wood erred by declining Winstar's express request for an opportunity to amend its complaint.  (Pls.' Mem. at 5-7.)

    1.    <u>**Applicable Law**</u>

The burden of a plaintiff in a private antitrust action to demonstrate that it has antitrust standing arises from Section 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may bring suit under the antitrust laws in the district courts for treble damages.  <u>See</u> 15 U.S.C. § 15 (1982).

It is an understatement to state that, "[i]n many ways the standing question is the most difficult issue in [a] case."  <u>Arroyo-Melecio v. Puerto Rican Am. Ins. Co.</u>, 398 F.3d 56, 72 (1st

Cir. 2005).  To begin with, the term "standing" has "caused confusion when used in the antitrust context as opposed to the constitutional sense."  <u>Alberta Gas Chem. Ltd. v. E.I. Du Pont De Nemours and Co.</u>, 826 F.2d 1235, 1239 (3d Cir. 1987).  The focus of antitrust standing is different from constitutional standing.  In the constitutional context, standing is concerned with whether "a party has sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy" and, among other things, requires a plaintiff to show that it has suffered an "injury in fact."  <u>See</u> <u>Sierra Club v. Morton</u>, 405 U.S. 727, 731 (1972).  While "harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact . . . [the doctrine of antitrust standing requires] the court [to] make a further determination [as to] whether the plaintiff is a proper party to bring a private antitrust action."  <u>Alberta</u>, 826 F.2d at 1239 (quoting <u>Associated Gen. Contractors</u>, 459 U.S. at 535 n.31).

In <u>Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519 (1983), widely regarded as the leading case on antitrust standing, the Supreme Court observed that "the mere fact that the claim is literally encompassed by the Clayton Act does not end the [standing] inquiry."  <u>Id.</u> at 537.  A court must consider, along with a number of other factors, "the nature of the plaintiff's alleged injury" in order to determine whether it is "of the type that the antitrust statute was intended to forestall."  <u>Id.</u> at 538, 540.

In defining antitrust injury, the Supreme Court has explained that:

> Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition.  The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.

Id. at 343-44.

The Third Circuit Court of Appeals echoed this notion in Eichorn v. AT&T Corp., 248 F.3d 131 (3d Cir. 2001), where it stated that "[i]t is well established that an antitrust injury reflects an activity's anticompetitive effect on the competitive market." Eichorn, 248 F.3d at 140 (citing Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990)). A plaintiff's personal grievance cannot be deemed an antitrust injury "unless the activity has a wider impact on the competitive market." Id. (citing City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 266-67 (3d Cir. 1998)).

The Third Circuit Court of Appeals has interpreted Brunswick and Associated Gen. Contractors to require a plaintiff to satisfy the antitrust injury requirement and also be the appropriate "person" to bring suit under the standing requirements. Antitrust injury is a threshold inquiry to be satisfied before the matter may proceed. See Alberta, 826 F.2d at 1240 (stating that "[o]nce antitrust injury has been demonstrated by a causal relationship between the harm and the challenged aspect of the alleged violation, standing analysis is employed to search for the most effective plaintiff from among those who have suffered loss"). In Angelico v. Lehigh Valley Hospital, Inc., 184 F.3d 268, 274 (3d Cir. 1998), the Third Circuit Court of Appeals enumerated the factors to be considered in an antitrust standing analysis:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

Id. at 274 (citations omitted).

      2.     **Analysis**

      For the purposes of the instant motions, this Court assumes the truth of Winstar's factual allegations, although this Court does not accept as true any conclusory or legal assertions.  See Morse, 132 F.3d at 906.  For the reasons set forth below, this Court concludes that Winstar has established standing to bring suit under the antitrust laws.

      Generally, Winstar claims that as a result of the unlawful conspiracy and agreements among Defendants to deny or restrict building access, it is being anticompetitively forced out of the market for the provision of telecommunications services.  (Compl. ¶ 7.)  Winstar also alleges that commercial office building tenants have been harmed because their choice of telecommunications carriers has been limited.  (Compl. ¶ 7.)  Thus, Winstar alleges that "[c]ompetition in the commercial telecommunications market has accordingly been eliminated or restrained."  (Compl. ¶ 7.)

      Specifically, Winstar claims that Defendants have conspired "to fix the rental price of building access for the provision of telecommunications services to commercial office building tenants."  (Compl. ¶ 51.)  Winstar asserts that these horizontal price-fixing agreements "have severely restrained and diminished competition in the relevant market."  (Compl. ¶ 51.)  Winstar also contends that Defendants have conspired not to deal with Winstar "by denying it access to the buildings they own or manage" – a horizontal agreement that constitutes an unlawful group boycott.  (Compl. ¶¶ 58, 63.)  Finally, Winstar argues that Defendants have conspired to impose discriminatory prices, terms, and conditions on Winstar's building access, thereby "substantially restrain[ing] and imped[ing] competition in the relevant market."  (Compl. ¶ 64.)

The threshold issue in the <u>Angelico</u> analysis is one of antitrust injury.  Trizec argues solely that Winstar has failed to establish standing because it has not articulated antitrust injury.[4] (Defs.' Mem. at 1-2.)  This Court disagrees: Winstar has alleged an injury "of the type for which the antitrust laws were intended to provide redress."  <u>Angelico</u>, 184 F.3d at 274.  Assuming the truth of Winstar's allegations that Defendants have combined in a horizontal agreement to disadvantage Winstar intentionally and impede its competition in the market, as this Court must at the motion to dismiss stage, this Court finds that Winstar has sufficiently alleged, for standing purposes, that Defendants' purported agreement has a market-wide impact on the competitive market.  <u>Eichorn</u>, 248 F.3d at 140 (citing <u>West Penn Power Co.</u>, 147 F.3d at 266-67).

Mindful of <u>Angelico</u>'s admonition not to confuse the issue of anticompetitive market effect with the antitrust injury requirement of the standing inquiry, <u>Angelico</u>, 184 F.3d at 275 n.2, but also noting <u>Eichorn</u>'s requirement that "antitrust injury reflect[] an activity's anticompetitive effect on the competitive market," <u>Eichorn</u>, 248 F.3d at 140, it appears to this Court that Winstar has alleged, at a minimum, that Defendants conspired to restrict or deny access to Winstar, as part of a larger campaign against other similarly-situated CLECs, and that this conduct resulted in a wide impact on the competitive telecommunications market.  (Compl. ¶¶ 2-7, 37, 41, 47-48.) Thus, this Court concludes that Winstar has standing to sue under the antitrust laws.[5]

---

[4]  In their joint supplemental memorandum, Defendants argue that Winstar lacks standing because it has not alleged a cognizable antitrust injury.  (Defs.' Mem. at 4.)  Defendants do not argue that Winstar has failed to establish any other factor of antitrust standing.

[5]  In the New York action, Judge Wood concluded that Winstar had merely alleged harm to itself as an individual competitor, and had not "alleged how Defendants' conduct has reduced competition among telecommunication services providers."  (J. Wood's order at 8.)  Judge Wood's decision is governed by a Second Circuit case, <u>Balaklaw v. Lovell</u>, 14 F.3d 793 (2d Cir. 1994).  In <u>Balaklaw</u>, the court concluded that the plaintiff anesthesiologist who competed for an

Furthermore, the Supreme Court has stated that "a § 4 plaintiff need not 'prove an actual lessening of competition in order to recover. [C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened.'" Blue Shield of Virginia v. McCready, 457 U.S. 465, 482 (1982). To the extent that Winstar is claiming that Defendants have conspired to drive it (and other CLECs) from the market, thereby resulting in a future reduction in competition, this Court finds that Winstar has alleged successfully antitrust injury sufficient to obtain standing. Although Winstar is not a direct competitor of Defendants, it appears that its alleged injury is sufficiently related to the injury Defendants allegedly sought to inflict on the market such that this Court may conclude that Winstar's alleged injury "flows from that which makes [D]efendants' acts unlawful" within the meaning of Brunswick. See McCready, 457 U.S. at 483-84.

Finally, this Court considers persuasive the notion that, assuming Defendants indeed have conspired to restrain trade in a manner in which the antitrust laws are designed to prevent, denying standing to Winstar might be "'likely to leave a significant antitrust violation undetected

---

exclusive contract, and lost it to another anesthesiology group, had not suffered an antitrust injury sufficient to confer standing upon him. Balaklaw, 14 F.3d at 802. The court noted that, since the market for anesthesiology services for hospitals was multi-state, if not national, the plaintiff had not provided any evidence to suggest that he was excluded from or substantially limited in the broader market for employment, and thus, had failed to demonstrate antitrust injury. Id. at 799. The court also relied in part on the lack of impact of the alleged unlawful restraint on the consumer, regardless of whether there had been an impact on the plaintiff competitor. Id. at 798 (noting that "[f]rom the consumers' point of view, nothing about the market has changed"). Judge Wood was persuaded further by the notion that this type of exclusive contract actually might foster competition, rather than restrain it, in that the competing anesthesiology groups would have strong incentives to offer competitive and improved care and prices in order to obtain exclusive contracts. Id. at 799. Judge Wood's decision emphasizes the Balaklaw court's observation that Dr. Balaklaw had "only established harm as an individual competitor." (J. Wood's order at 9 n.8) (citing Balaklaw, 14 F.3d at 797). While Balaklaw may be persuasive, it is not binding in this Circuit.

or unremedied.'" Yellow Pages Cost Consultants, Inc. v. GTE Directories Corp., 951 F.2d 1158, 1164 (9th Cir. 1991).  Winstar has alleged that it, along with other CLECs, is the specific target of Defendants' alleged anticompetitive conspiracy to disadvantage it within the market.  (Compl. ¶¶ 2-7, 37, 41, 47-48.)  Thus, Winstar has established that, if an anticompetitive practice does in fact exist, Winstar is the most direct victim.  Based on Winstar's allegations, this Court cannot speculate that there exists a more appropriate antitrust plaintiff in this context who is "better poised to vindicate the public interest in antitrust enforcement."  Yellow Pages, 951 F.2d at 1163. Winstar has established sufficient antitrust injury to give it antitrust standing.

**B.**     **Failure to State a Claim**

      **1.**     **Counts 1 & 2 – Federal and State Antitrust Claims**[6]

"To establish a section 1 violation for unreasonable restraint of trade, a plaintiff must prove (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997). Winstar has alleged three distinct violations of § 1 of the Sherman Act: (1) a discriminatory pricing scheme in violation of the rule of reason; (2)  a per se price fixing violation; and (3) a per se group boycott.  (Compl. ¶¶ 51-67.)

      **a.**     **Rule of Reason Violation (Price Discrimination)**

Winstar claims that "Defendants have colluded, conspired and agreed, among themselves

---

    [6]  Winstar admits in its Complaint that "[t]he New Jersey Antitrust Act parallels the Sherman Act and is to 'be construed in harmony with judicial rulings' under the Sherman Act." (Compl., at ¶ 69 (citing N.J. STAT. ANN. § 56:9-18).)  Thus, Winstar's federal and state antitrust claims shall be treated together and dismissed on the same grounds.

and with Verizon and other ILECs, to impose discriminatory and less favorable prices, terms and conditions on Winstar's access to their commercial properties than those applied to Verizon and other ILECs."  (Compl. ¶ 64.)  For antitrust violations not within the per se category of invalidity, courts employ a rule of reason test.[7]  Eichorn, 248 F.3d at 138.  This Court finds that Winstar has failed to allege a rule of reason violation adequately.

Under a rule of reason analysis, a valid claim must allege facts which, if true, are sufficient to establish the four elements of the § 1 analysis.  In order to establish the second element, that the Defendants' actions produced anticompetitive effects within the relevant product and geographic markets, the plaintiff must allege that particular, actual anticompetitive effects occurred within these markets, such as price increases or output reduction.  See F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61 (1986).  Because "[s]uch proof is often impossible to make . . . due to the difficulty of isolating the market effects of challenged conduct . . . , courts typically allow proof of the defendant's 'market power' instead.  Market power [is] the ability to raise prices above those that would prevail in a competitive market."  United States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993) (internal citations omitted).  As with actual anticompetitive effects, market power must be shown in the relevant product and geographic markets.

Here, Winstar has not alleged sufficiently that Trizec's conduct has been "unreasonably restrictive of competitive conditions" to state a § 1 claim under either the actual competitive

---

[7]"Under the per se test, agreements whose nature and necessary effect are so plainly anti-competitive that no elaborate study of the industry is needed to establish their illegality are found to be antitrust violations. . . Under [the rule of reason] test, plaintiffs have the burden of establishing that, under all the circumstances, the challenged acts are unreasonably restrictive of competitive conditions in the relevant market."  Eichorn, 248 F.3d at 138.

effects or market power approaches. Actual anticompetitive effects are typically measured by price increase or output reduction, but Winstar has not alleged that these effects occurred in the market for provision of telecommunications services. Winstar does allege that Defendants increased the price of building access for Winstar, (Compl. ¶ 37), but to the extent that Winstar is asserting that the increased prices in building access are evidence of actual anticompetitive effects, this effort fails for two reasons.

First, Winstar claims a restraint on competition in the telecommunications services market, but has not alleged an increase in the price of telecommunications services that could evidence actual anticompetitive effects in that market.

Second, and more importantly, Winstar is claiming that a restraint of trade has occurred in the market for the <u>provision</u> of telecommunications services, not in the market for building <u>access</u>. (Compl. ¶ 7) (emphasis added). Therefore, even if there has been a market-wide rise in price for building access, this Court cannot infer reasonably that price increases in building access have resulted in price increases for telecommunications services, evidencing actual anticompetitive effects.

Winstar also fails to state a claim for anticompetitive effects using the market power approach. To state a valid claim under this approach, Winstar must, *inter alia*, define the relevant product and geographic markets in which market power is alleged. "[T]he proper definition of the market is a 'necessary predicate' to an examination of the competition that may be affected." <u>Brown Shoe Co. v. United States</u>, 370 U.S. 294, 335 (1962). A plaintiff may also define a sub-market as the area in which market power may be found. "The boundaries of such a sub-market may be determined by examining such practical indicia as industry or public

16

recognition of the sub-market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."  <u>Id.</u> at 325.

Winstar alleges that the relevant product market is "the provision of telecommunications services to tenants in commercial office buildings."  (Compl. ¶ 28.)  Winstar alleges that the relevant geographic market is "the United States and includes sub-markets, such as the State of New Jersey, because <u>access</u> for telecommunications purposes to commercial office buildings in one city or location is not a good substitute for <u>access</u> to commercial office buildings in other cities or locations."  (Compl. ¶ 28) (emphasis added).   Winstar's market definitions suffer from several fatal defects.

First, to the extent that Winstar defines the geographic market as the entire United States, it has not alleged facts sufficient for a conclusion that Defendants have market power over the national market for provision of telecommunications services.  Second, to the extent that Winstar defines the relevant geographic market as "includ[ing] sub-markets," this is simply too undefined to state a claim of anticompetitive power in a specific sub-market.  Third, to the extent that Winstar defines the relevant geographic market as the sub-market of the State of New Jersey, Winstar has not stated sufficient facts to support this sub-market definition.

Lastly, Winstar's market definition incorporates two different kinds of markets: "provision of telecommunications services" and "access for telecommunications purposes to commercial office buildings."  (Compl. ¶ 28.)  Winstar justifies its claim of market power in the sub-market of the State of New Jersey by connecting the two: "landlords enjoy locational market power in the sale of building access."  (Compl. ¶ 30.)  This, however, is the wrong market power:

17

it is not power in the relevant product market, defined by Winstar as the provision of telecommunications services.  (Compl. ¶ 28.)  Winstar does not explain how power in the market for building access produces power in the market for telecommunications services, nor does it allege facts sufficient to support such an argument, had it made it.

Defendants do not compete in the market for provision of telecommunications services.  Even if this Court assumes the truth of Winstar's allegation that Defendants have conspired to impose discriminatory prices upon Winstar for building access, in order for the Court to find that Winstar has alleged sufficiently a restraint on competition in the telecommunications services market, the Court would have to assume further that, through this discriminatory pricing in the building access market, Defendants aimed to restrain competition in the market for provision of telecommunications services – a market in which Defendants do not compete.

Winstar has not alleged sufficient facts to permit this Court to find that a restraint in the market for building access has resulted in a restraint in the product market for telecommunications services.  This Court is not required, nor would it be "proper to assume that [Winstar] can prove facts that it has not alleged or that [D]efendants have violated the antitrust laws in ways that have not been alleged."  Associated Gen. Contractors, 459 U.S. at 526.

For all the reasons cited, Winstar's market definitions are insufficient to state a valid claim for anticompetitive market power.  As dictated by the Supreme Court, "in a case of this magnitude, a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed."  Id. at 528 n.17.

Because Winstar has failed to allege sufficient facts concerning the anticompetitive effects of Defendants' conduct in the relevant product and geographic markets in which Winstar

alleges that trade has been restrained, under either the actual anticompetitive effects or market power approaches, this Court cannot conclude that Winstar has stated a claim for a rule of reason violation.  Thus, Winstar's rule of reason price discrimination claim will be dismissed.

> **b.**   **Price Fixing**

Winstar alleges in Counts 1 and 2 that Defendants "have colluded, conspired and agreed . . . to fix the rental price of building access for the provision of telecommunications services to commercial office building tenants.  This horizontal conspiracy . . . constitutes a per se violation of Section 1 of the Sherman Act."  (Compl. ¶¶ 51, 54.)

Although most restraints are analyzed under the traditional "rule of reason," Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977), "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable."  N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958).  Such practices are deemed to be "illegal per se."  Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978).  The per se rule of illegality, however, is "based in large part on economic predictions that certain types of activity will more often than not unreasonably restrain competition."  Brown Univ., 5 F.3d at 670; see also Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 344 (1982) ("Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is unreasonable"); Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 289 (1985) ("Th[e] per se approach permits categorical judgments with respect to certain business practices that have proved to be predominantly anticompetitive"); NCAA v. Bd. of Regents of the Univ. of Oklahoma, 468 U.S.

85, 103-04 (1984) ("Per se rules are invoked when the surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct").  For the following reasons, this Court determines that Winstar's claim of price fixing, as currently alleged, should not be subject to the per se rule of illegality, and rather, should be subject to a rule of reason analysis.

Winstar's price fixing claim centers upon action allegedly taken by BOMA and BOMA-NJ to encourage their members "to offer uniform and less favorable terms to Winstar than to Verizon or other ILECs."  (Compl. ¶ 52.)  Winstar refers to model agreements, "best practices," and other related materials distributed to BOMA's members by their trade association.  (Compl. ¶ 52.)  Defendants argue, however, that "BOMA's development of model agreements and 'best practices' for building access was a lawful trade association activity that was specifically encouraged by the FCC."  (BOMA Br. at 17.)

This Court cannot conclude with confidence that the price fixing conspiracy alleged in this case presents an unreasonable restraint on competition in the telecommunications service market such that it should be conclusively presumed per se illegal, and that further examination of the facts and circumstances would be unjustified.  First, it is only very recently that Congress and the FCC have begun to scrutinize the issue of competition in the local telecommunications markets, and the issues arising out of the passage of the Telecommunications Act of 1996 are still being addressed.  (BOMA Br. at 6.)  In addition, the courts have not yet begun to publish consistent pronouncements on the issue.[8]  Because this is not the type of circumstance where this

---

[8]  Notably, the Third Circuit has stated that:

. . . concerted action does not exist every time a trade association member speaks or

Court can easily ascertain the great likelihood of anticompetitive effects, see California Dental

Ass'n v. FTC, 526 U.S. 756, 770 (1999), this Court holds that, as currently alleged, Winstar's

claim of price fixing should not be analyzed under the per se rule, but rather under the full rule of

reason.  Because of Winstar's failure to state a claim for anticompetitive effects, delineated

above (failing to specify particular adverse effects on competition in particular markets),

Winstar's price fixing claim, analyzed under the rule of reason, also must fail.  Therefore, this

Court will dismiss Winstar's claim of price fixing.

### c.   **Group Boycott**

In Counts 1 and 2, Winstar claims that "Defendants have colluded, conspired and agreed

not to deal with Winstar by denying it access to the buildings they own or manage," constituting

"per se unlawful group boycotts in violation of Section 1 of the Sherman Act."  (Compl. ¶¶ 58,

63.)

In certain instances, concerted refusals to deal or group boycotts are "so likely to restrict

competition without any offsetting efficiency gains that they should be condemned as per se

violations of § 1 of the Sherman Act."  Northwest Wholesale, 472 U.S. at 290.  Generally, the

per se approach to boycotts is applied in cases where there are "joint efforts by a firm or firms to

disadvantage competitors by 'either directly denying or persuading or coercing suppliers or

customers to deny relationships the competitors need in the competitive struggle.'"  Id. at 294

(quoting L. SULLIVAN, LAW OF ANTITRUST 261-62 (1977)).  The Third Circuit has echoed that

---

acts.  Instead, in assessing whether a trade association (or any other group of
competitors) has taken concerted action, a court must examine all the facts and
circumstances to determine whether the action taken was the result of some
agreement, tacit or otherwise, among members of the association.
Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1007-08 (3d Cir. 1994).

narrow construction of the per se rule for boycotts.   See Eichorn, 248 F.3d at 143 (citing

Northwest Wholesale, 472 U.S. at 289-90 (per se rule confined to limited types of anti-

competitive practices); Larry Muko, Inc. v. Southwestern Pa. Bldg. and Const. Trades Council,

670 F.2d 421, 429 (3d Cir.) ("Generally the application of the per se rule has been limited to

those 'classic' boycotts in which a group of business competitors seek to benefit economically by

excluding other competitors from the marketplace"), cert. denied, 459 U.S. 916 (1982)).

        As a general matter, "[t]he Supreme Court has been cautious in extending the per se

approach to claims that fall outside certain previously enumerated categories of liability."

Eichorn, 248 F.3d at 143 (citations omitted).  Thus, "claims not within established categories of

antitrust liability are more appropriately analyzed under the rule of reason where courts can

balance the effect of the alleged anticompetitive activity against its competitive purposes within

the relevant product and geographic markets."  Id.

        Based on the judicial reluctance to analyze boycott claims under the per se rule, as well as

upon this Court's review of the Complaint, it appears that the circumstances of the alleged

boycott in this case do not fall within the narrow scenario detailed by the Court in Northwest

Wholesale.  In this case, Winstar alleges that the Building Defendants conspired with each other

and BOMA to engage in a group boycott of Winstar.  (Compl. ¶¶ 58, 63.)  However, Winstar is

not a competitor of either BOMA or the Building Defendants.  Winstar is in competition with

other CLECs, Verizon, and other ILECs.  This case does not fall within the Northwest Wholesale

per se rule, which applies only to boycotts by competitors against competitors.[9]  Therefore, this

_____

[9] Winstar specifically alleges that:

Through and with BOMA, the Owner-Manager Defendants, together with other co-

22

Court holds that, as currently alleged, Winstar's group boycott claim should not be analyzed under the per se rule, but rather under the full rule of reason.

Because of Winstar's failure to state a claim for anticompetitive effects, Winstar's group boycott claim, analyzed under the rule of reason, must also fail.  Therefore, this Court will dismiss Winstar's group boycott claim.

Because this Court has determined that Winstar has failed to state a claim upon which relief may be granted for violations of section 1 of the Sherman Act, this Court dismisses Counts 1 and 2 of the Complaint, without prejudice, allowing Winstar to re-plead to address its present deficiencies.

### 2.   Count 3 – The Communications Act of 1934, as amended

Winstar asserts this claim against the Building Defendants only.[10]  This claim arises from the Communications Act of 1934 ("the Act").  See 47 U.S.C. §§ 201(b) and 202(a).  The Act makes it unlawful for any "common carrier" of telecommunications services to discriminate in prices or practices.  See 47 U.S.C. §§ 201(b)[11] and 202(a).[12]

---

> conspirator real estate owners and managers not parties to this action, have entered into exclusive arrangements for building access pursuant to which they receive equity and/or revenue-sharing compensation from their preferred telecommunications provider.  In light of these exclusivity provisions, Defendants' [sic] have refused to execute building access arrangements with Winstar for certain of their commercial properties.

(Compl. ¶ 58.)  Winstar has not implicated Verizon or other ILECs in the concerted refusal to deal beyond alleging that Defendants have chosen Verizon and other ILECs to be their exclusive "preferred providers."  (Compl. ¶ 58, 61.)  Winstar also has not alleged or intimated that Verizon or other ILECs are at all involved in the conspiracy to boycott Winstar.

[10] Of the Building Defendants, Trizec is the only remaining defendant.

[11] Section 201(b) declares that, for "common carriers," "[a]ll charges, practices, classifications, and regulations for and in connection with such communication service, shall be

Winstar alleges that the Building Defendants are "common carriers" subject to the Act because the Building Defendants have entered into arrangements with "preferred" telecommunications carriers wherein the carriers were given exclusive access to the properties in exchange for the Building Defendants' equity interests in the carriers or revenue-sharing with the carriers. (Compl. ¶ 73.) Winstar claims that, based upon the revenue-sharing agreements between the Building Defendants and the "preferred carriers," the Building Defendants are de facto "common carriers" of telecommunications services. (Compl. ¶ 74.) Winstar then claims that these exclusive agreements deny access to Winstar, and amount to discriminatory practices and pricing proscribed by the Act. (Compl. ¶ 77.)

The Building Defendants argue that this claim cannot survive because §§ 201 and 202 only apply to "common carriers," which they are not. (Building Defs.' Br. at 38-46.) This Court agrees. Because Winstar has not alleged facts to support the theory that the Building Defendants are "common carriers" of telecommunications services, this Count is dismissed with prejudice.

The text of the Act defines and describes "common carrier" as an entity that is "engaged in providing telecommunications services." 47 U.S.C. § 153(44). To determine whether an

---

just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b).

    [12] Section 202(a) makes it unlawful for any "common carrier":
> to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a).

entity is a "common carrier," see FCC v. Midwest Video Corp., 440 U.S. 689, 700-01 (1979), courts should examine: (1) whether the carrier "undertakes to carry for all people indifferently," see Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 525 F.2d 630, 641 (D.C. Cir. 1976) (internal quotation marks and citation omitted); and (2) whether the system is such that customers transmit intelligence of their own design and choosing, see Nat'l Ass'n of Regulatory Util. Comm'rs, 533 F.2d at 609.  The Building Defendants are not "engaged in providing telecommunications services," 47 U.S.C. § 153(44), nor do the factual allegations support the finding that the Building Defendants satisfy the first prong of the test articulated above.

Winstar claims that the Building Defendants should be deemed "common carriers" because they are resellers of telecommunications services who are subject to "common carrier" duties under the Act.  According to Winstar, "common carrier duties apply to any entity that: (1) independently or jointly through a resale or joint service provider arrangement, (Pls.' Br. in Opp'n to the Building Defs.' Mot. to Dismiss ("Pls.' Opp'n") at 36 (citations omitted)); (2) offers 'transmission, between or among points specified by the user, of information of the user's choosing.'" (Pls.' Opp'n at 36) (quoting 47 U.S.C. § 153(43)).

Defendants argue that Winstar's characterization of them as "resellers" that are subject to §§ 201(b) and 202(a) of the Act as "common carriers" is flawed, and thus, must fail.  (Building Defs.' Br. at 44.)  This Court agrees.

Resale is "an activity wherein one entity subscribes to the communications services and facilities of another entity and then reoffers communications service and facilities to the public . . . for profit."  Resale and Shared Use Order, 60 F.C.C.2d 261, 261 ¶ 17 (1976).  The Third Circuit Court of Appeals described the resale market as follows:

> Resellers . . . subscribe to AT&T programs which provide large discounts for high volume purchases of AT&T telecommunications services.  The resellers then sell the services to individual businesses that do not generate sufficient volume to qualify individually for the high-volume discounts.  Thus, by providing the services to these end-users, resellers make a profit while end-users receive access to the AT&T network at a significantly lower cost than if they purchased services from AT&T directly . . . in the resale business, only the reseller is a customer of AT&T; the end-users are customers of the reseller and not AT&T.

AT&T v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1423 (3d Cir. 1994).

The Building Defendants are not customers of the telecommunications providers, i.e., they do not purchase the telecommunications services from the providers.  (Building Defs.' Br. at 23.)  The end-users of the telecommunications services, the tenants, are direct customers of the telecommunications providers, not the Building Defendants.  Winstar has not alleged facts to show that the Building Defendants act as the sort of intermediaries or intermediate providers of telecommunications services intended to be captured by the term "resellers" that are subject to "common carrier" duties under the Communications Act.  Thus, its attempt to seek relief against the Building Defendants under this theory must fail.

Finally, Winstar attempts to argue that it has pled adequately a claim for relief under the Communications Act "regardless of whether the Defendants are common carriers," because Winstar claims that "Defendants violated Sections 202(a) and 201(b) of the Act, which prohibit discrimination and unreasonable practices 'in connection with' telecommunications services." (Pls.' Opp'n at 47.)  This basis for relief also fails.

In asserting this theory of relief, Winstar appears to have overlooked the fact that the Act's prohibition against unjust or unreasonable practices expressly applies to "any common carrier."  See 47 U.S.C. § 202(a).  Indeed, the Act states: "It shall be unlawful for any common

26

carrier to make any unjust or unreasonable determination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service." 47 U.S.C. § 202(a) (emphasis added). Furthermore, Section 201 expressly provides that the chapter applies to "common carriers." 47 U.S.C. §§ 201(a) and (b). In fact, the relevant subchapter of the statute containing both §§ 201 and 202 is entitled "Common Carriers," and the relevant part is entitled "Common Carrier Regulation." Winstar cannot seek relief under §§ 201 and 202 against parties who are not common carriers.

Winstar has not alleged facts to support its assertion that the Building Defendants are "common carriers," subject to liability under the Communications Act. Thus, Count 3 is dismissed with prejudice.

**3.      Counts 4 & 5 - State Common Law Claims**

Count 4 asserts tortious interference with prospective business relations on the part of all Defendants, and Count 5 asserts breach of the duty of good faith and fair dealing on the part of the Building Defendants. These are claims under state law.

Based upon this Court's dismissal of all other counts of the Complaint, this Court declines to exercise supplemental jurisdiction over these state law claims, pursuant to 28 U.S.C. § 1367. This Court dismisses these claims without prejudice because this Court cannot conclude that Winstar's amendment of its antitrust claims would be futile. Thus, if Winstar successfully re-pleads its Sherman Act claims, satisfying federal question jurisdiction under 28 U.S.C. § 1331, this Court may exercise supplemental jurisdiction over any state or common law claims under 28 U.S.C. § 1367.

27

## <u>CONCLUSION</u>

For the reasons set forth above, Trizec's motion to dismiss is granted.  Accordingly,

Counts 1, 2, 4, and 5 are dismissed without prejudice and Count 3 is dismissed with prejudice.

Winstar, if it so chooses, may file an amended complaint within forty-five (45) days of the entry

of this Court's order.


Dated: December 14, 2005

           S/Joseph A. Greenaway, Jr.
           JOSEPH A. GREENAWAY, JR., U.S.D.J.